No. 40,382

E. V. BAKER, *Appellant*, v. THE HUGOTON PRODUCTION COMPANY, a Corporation, and A. V. YOUNGREN and GLADYS YOUNGREN, *Appellees*.

(310 P. 2d 889)

Opinion filed May 11, 1957.

*Dale M. Stucky*, of Wichita, argued the cause, and *A. E. Kramer* and *Bernard E. Nordling*, both of Hugoton, and *Howard T. Fleeson, Homer V. Gooing, Wayne Coulson, Paul R. Kitch, Donald R. Newkirk, Robert J. Hill, Gerrit H. Wormhoudt, Theodore C. Geisert* and *Philip Kassebaum*, all of Wichita, were with him on the briefs for the appellant.

*J. S. Brollier*, of Hugoton, argued the cause, and *Paul A. Wolf*, of Hugoton, was with him on the briefs for A. V. Youngren and Gladys Youngren, appellees. *Ray H. Calihan, Logan N. Green, Daniel R. Hopkins* and *Ray H. Calihan, Jr.*, all of Garden City, were on the briefs for The Hugoton Production Company, appellee.

The opinion of the court was delivered by

PRICE, J.: The question in this case involves the construction of a written instrument designated as "Sale of Oil and Gas Royalty."

More specifically, the basic question is whether production on a part of the 3630 acres covered by the instrument during its primary term perpetuated or extended the grantee's interest as to 680 acres included therein on which there was no development or production until after the expiration of the primary term.

The trial court answered the question in the negative and plaintiff grantee has appealed.

Material portions of the instrument in question executed by defendants Youngren read:

"SALE OF OIL AND GAS ROYALTY.

"KNOW ALL MEN BY THESE PRESENTS:

"That Amos V. Younggren, (sometimes written A. V. Younggren) and Gladys Younggren, Husband and wife, of Stevens County, State of Kansas, for and in consideration of the sum of Ten Thousand Eight Hundred Ninety and no/100 Dollars ($10,890.00) cash in hand paid by Western Royalty and Development Company, a corporation, hereinafter called Grantee, the receipt of which is hereby acknowledged, have granted, sold, conveyed, assigned and delivered, and by these presents do grant, sell, convey, assign, and deliver unto said Grantee, an undivided one-fourth interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in Stevens County, State of Kansas, to-wit:

(Descriptions omitted.)

containing 3630 acres, more or less, together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said lands for oil, gas and other minerals and removing the same therefrom, with the right at any time to remove any or all equipment in connection therewith.

"Said land being now under various oil and gas leases executed in favor of C. F. Mangels (and his Assigns) it is understood and agreed that this sale is made subject to the terms of said leases but covers and includes one-fourth of all the oil royalty, and gas rental or royalty due and to be paid under the terms of said leases.

"It is understood and agreed that one-fourth of the money rentals which may be paid to extend the term within which a well may be begun under the terms of said leases is to be paid to the said Grantee and in the event that one or more of the above described leases for any reason become cancelled or forfeited then and in that event an undivided one-fourth of the lease interests and all future rentals and bonuses on said land for oil, gas and other mineral privileges shall be owned by the said Grantee owning one-fourth of all oil, gas and other minerals in and under said lands, together with one-fourth interest in all future events.

"To HAVE AND TO HOLD the above described property, together with all and singular the rights, appurtenances thereto in anywise belonging unto the said Grantee herein, its successors and assigns for a term of 20 years, commencing on the 5th day of July, 1930, and as long thereafter as oil, gas or either of them are being produced from said land or operations are in progress thereon by grantors or grantees or their respective heirs, successors or assigns; and we do hereby bind ourselves and our heirs, executors and administrators to warrant and forever defend all and singular the said property unto said Grantee herein its successors, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, and agree that the Grantee shall have the right at any time to redeem for Grantors by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by grantors, and be subrogated to the rights of the holder thereof.

"Witness our hands this 11th day of August, 1930.

"Amos V. Younggren
Gladys Younggren"

Through various conveyances and transfers, plaintiff Baker, in 1938, became the owner of the undivided one-fourth interest covered by the instrument.

There is no dispute as to the facts, and the case was tried upon the pleadings and stipulation of the parties. The various leases on the lands covered by the instrument at the time of the conveyance were apparently later released, there being no development or production under any of them. New leases were later executed by plaintiff and defendants. Each lease covered only a portion of the lands described in the instrument. Ultimately, various portions of the lands were separated and through unitization agreements were separated and placed in ten different gas-producing units. Only two of the units consisted entirely of lands described in the instrument. Eight of the ten units contained some lands described in the instrument, and other lands in which neither plaintiff nor defendants claim an interest. Royalty from gas production in each unit is attributable only to the lands within the unit, and is payable only to the owners of royalty or mineral interests in the unit. Each unit is autonomous, is completely separate and independent, and gas production from a unit does not extend or perpetuate the leases on any other unit.

Gas was being produced, and plaintiff and defendants were receiving royalty, from seven of the ten units on and prior to the expiration date (July 5, 1950) of the primary term of the instrument, and there is no question about plaintiff's right to continue to receive royalty from those seven units. The leases on the remaining three units covering 680 acres, they being the ones in controversy, are owned and operated by defendant production company, and since this controversy arose the company has paid into court the disputed gas royalties to be disbursed by order of the court to the party or parties entitled thereto. In other words, insofar as this dispute is concerned, defendant production company is an innocent bystander.

Plaintiff Baker contends that production of gas on seven of the units, or any of them, during and continuing to the end of the primary term of the written instrument, operated to extend or perpetuate his interest as to the 680 acres on which there was no development or production until after the expiration of the primary term, and he claims ownership of one-fourth of the gas royalties from that acreage. Defendants deny plaintiff's claim and contend that as to

the 680 acres plaintiff's rights were extinguished by the fact that no development or production was had on such lands during the 20-year primary term.

At the time the case was decided the trial court filed a memorandum opinion, and as it clearly sets forth the issues and the reasons for the decision, we quote it in full:

"The controversy in this case is between E. V. Baker, plaintiff, sometimes hereinafter referred to as Grantee, and A. V. Younggren and wife, sometimes hereinafter referred to as Grantor.

"The question involved in this action is based upon the construction of an instrument designated as 'Sale of Oil and Gas Royalty.'

"This instrument grants, sells, conveys, assigns and delivers unto grantee an undivided ¼th interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in Stevens County, Kansas, to-wit:

(describes 3,630 acres of land.)

"To Have and to Hold . . . for a term of 20 years, commencing on the 5th day of July, 1930, and as long thereafter as oil, gas or either of them are being produced from said land or operations are in progress thereon by grantors or grantees or their respective heirs, successors or assigns . . .

"2950 acres of this land, on July 5, 1950, were included in eight operating agreements and units and upon each unit there was a producing gas well on said date. There is no dispute between the parties as to said 2,950 acres.

"The NE¼ 3-32-39, containing 160 acres, is subject to an oil and gas lease dated October 30, 1945, executed by the plaintiff Baker and the defendants Younggren as lessors. Said lease was included in a gas producing unit with other lands not involved herein. This producing unit was accomplished by an instrument designated as 'Declaration of Unitization and Consolidation,' dated November 20, 1952, and executed and filed by the lessee, under a provision in the respective oil and gas leases granting said lessee such power, and was not executed by either plaintiff Baker nor the defendants Younggren. The producing gas well on this unit was drilled on other lands not involved herein and was producing gas before the oil and gas lease covering the NE¼ 3-32-29 was executed.

"The NW¼ 11-32-39, containing 160 acres, is subject to an oil and gas lease, dated October 30, 1945, and was executed by the plaintiff Baker and the defendants Younggren. Another oil and gas lease, dated October 30, 1945, covered the S½-SW¼ 11-32-39, the NW¼-SW¼ 11-32-39 and the N½ NW¼ 14-32-39, containing 200 acres was also executed by the plaintiff Baker and the defendants Younggren. Said leases were included in a gas producing unit with other lands not involved herein. This producing unit was also accomplished by an instrument designated as 'Declaration of Unitization and Consolidation,' dated November 30, 1951. A producing gas well was drilled and finished on said unit on December 22, 1951.

"The NW¼ 5-32-38, containing 160 acres, is included with other lands not involved herein in a Unit Operating Agreement, dated March 13, 1950, and was executed by the plaintiff Baker and the defendants Younggren. Said

agreement specified that the same contained 640 acres. Under date of October 30, 1952, an amended Unit Agreement signed by the plaintiff Baker and the defendants Younggren, including the same leases and lands, amended the original Unit Agreement dated March 13, 1950. This Amended agreement, insofar as is material herein, states:

" '1 said gas unitization agreement is hereby modified and amended so that the same as amended shall show the unitized area therein to consist of 643.29 acres, more or less . . . . .

" '3. Except as modified and amended with the foregoing paragraphs, the terms and provisions of said gas unitization agreement shall be and remain in full force and effect and each of the parties hereto ratifies and affirms the same and the provisions therein contained.'

"A producing gas well was drilled in 1953 on the NW¼ 5-32-38.

"The question herein is based upon the construction of the words 'To HAVE AND TO HOLD the above described property . . . for a term of 20 years; . . . and as long thereafter as oil, gas or either of them are being produced from said land,' and the interpretation placed thereon by the grantor and grantee at the time the instrument was executed. This instrument is unambiguous in its terms when construed as a whole and the intention of the parties must be gleaned from the four corners of the instrument. See *Brungardt v. Smith*, 178 Kan. 629, and the cases cited therein.

"Other clauses in the instrument help in determining the intention of the parties. The instrument states: 'Said land being now under various oil and gas leases executed in favor of C. F. Mangels (and his assigns) it is understood and agreed that this sale is made subject to the terms of said leases but covers and includes one-fourth of all the oil royalty, and gas rental or royalty due and to be paid under the terms of said leases.'

"Also the grantee, in brief without quoting the exact wording of said instrument, is given the right of ingress and egress for the purpose of exploring and drilling said lands and removing therefrom the oil, gas and other minerals. If the Mangels leases are forfeited or cancelled, the grantee in the mineral conveyances on his undivided ¼ mineral interest has the sole right to lease the same and participates in all bonuses for new leases, all rentals therefrom as well as all royalties paid by virtue of future leases. In other words, the grantee has all the incidents of ownership in said undivided ¼ interest in said oil, gas and other minerals until July 5, 1950. During said 20 years the grantee and the grantor have the same incidents of ownership in their undivided and respective interests in said minerals.

"At the end of 20 years, or as in this case after July 5, 1950, the incidents of ownership of the grantee must be determined. If the intention of the parties was to continue the mineral estate of the grantee beyond the 20 years or primary term upon the production of gas from any well or wells located any place upon the 3,630 acres (regardless of whether the unit agreement and oil and gas leases, under which production is procured, define a certain number of acres as producing acreage) then all the incidents of ownership are extended beyond the 20 years primary term the same is extended as to all of said 3,630 acres as long as oil, gas or other minerals are produced from any part of said land. This in turn would extend to the grantee all rights to execute new oil and gas

leases, unitization agreements and all other rights in connection therewith as long as there was any production from any part of said 3,630 acres.

"The grantee purchased and paid for a limited conveyance which was limited to 20 years and was to be extended only upon the fulfillment of the contingency which was the production of oil, gas or other minerals before the expiration of said 20 years.

"The instrument under construction states: 'said land being now under various oil and gas leases executed in favor of C. F. Mangels.' Although the instrument does not specifically state that all of said land is under various oil and gas leases to C. F. Mangels and does not state how many leases are on said land, nor how many acres each lease covers, it is definite that there is more than one lease on the 3,630 acres, and probably there were several leases thereon, and perhaps all of said land was covered by several oil and gas leases to C. F. Mangels.

"The situation on August 11, 1930, the date of said instrument, was that the drilling of a producing gas well on each of the leases would under the terms of that lease extend the terms thereof beyond the primary term of such lease on the land described in said lease and on those lands only. Therefore the minerals owned by the grantor or grantee would be cured (using oil field terminology as to the word 'cured') only as to the lands included in each lease upon which a producing gas well was drilled and produced.

"As a standard practice substantially the same words are used in creating the contingency extending the terms of oil and gas leases and term mineral conveyances beyond their primary terms, e. g. 'as long thereafter as oil or gas or either of them is produced from said land.' The same is true in this case.

"If a producing gas well only cures the minerals owned by the grantor that were included in the lease upon which a producing gas well is located, can it be said that it was the intention of the parties to the mineral conveyance that an undivided interest in the same minerals owned by the grantee would be cured on different or more lands? As to the leasehold estate the answer is No. Is the answer the same as to the mineral estate?

"Applied to the facts herein the grantor and the grantee each owned an undivided interest in all of the 3,630 acres. Each oil and gas lease on any part of said 3,630 acres covered the minerals and mineral rights of both the grantor and the grantee but only on the lands described in each particular lease. Can it therefore be said that the parties contemplated that a producing gas well would cure more minerals for the grantee than it would cure for the grantor under a conveyance that mentioned oil and gas leases to C. F. Mangels, which conveyance stated 'It is understood and agreed that this sale is made subject to the terms of said leases but covers and includes ¼ of all the oil royalty, and gas rental or royalty due and to be paid under the terms of said leases'?

"The grantee also acquired the right to execute future oil and gas leases on his undivided mineral rights in the event the C. F. Mangels leases are forfeited or cancelled. He had the right, which he exercised, to determine what part of the lands under which he owned minerals, would be leased, the term of such leases and the lands to be included in each lease. He also acquired the right the grantor had to drill said lands himself in the event one or all of the Mangels leases were forfeited or cancelled.

"In order to arrive at the interpretation placed upon said mineral conveyance by the plaintiff Baker, it would be necessary to construe the words 'said land' as used in the habendum clause as meaning any part of said land. In view of the other clauses in said instrument discussed above I do not believe that such a narrow construction was the intention of the parties.

"What part of said land was, on July 5, 1950, actually producing gas? This matter cannot be determined with any accuracy by any present methods used by the oil and gas industry. Therefore, the Courts must look for the intention of the parties as expressed in mineral conveyances, oil and gas leases, unit agreements or other contracts between the parties involved or to the findings and orders of the Kansas Corporation Commission. In this case the terms of the mineral conveyance give the answer.

"An additional point is presented as to the NW¼ 5-32-38, by paragraph No. 3 of the Amended Unit Operating Agreement, dated October 30, 1952, which agreement was executed by the plaintiff Baker and the defendants Younggren more than two years after the expiration of the primary term of the mineral conveyance. Said paragraph No. 3 ratifies and affirms the original Unit Operating Agreement dated March 13, 1950.

"The purpose of said Amended Unit Operating Agreement was to change the acreage covered by said original agreement to cover 643.29 acres instead of 640 acres as covered by the original agreement, and was between the plaintiff Baker, the defendants Younggren and others, as lessors, to Hugoton Production Company, a corporation, as lessee. Such purpose is clearly expressed by the terms of said amended agreement.

"The ratification and affirmation was between the lessors and the lessees and ratified the terms of the oil and gas lease covering the lands therein contained and was for the benefit of the lessee. The effect thereof was to confirm the fact that as of the date thereof the lessee had performed all the conditions and obligations created by the oil and gas leases and Unit Operating Agreements covering the land covered thereby. It was not meant as an instrument adjusting or settling differences as to property rights between the lessors.

"If the Court is correct in its holding that the mineral interest of the plaintiff Baker terminated by the terms of the original grant on July 5, 1950, then there was nothing left upon which a ratification or affirmation could attach. In other words a new estate would have to be created in said land which created new conditions or obligations before ratification or affirmation could operate. The effect would be to ratify and confirm nothing.

"Judgment for the defendant, in accordance herewith, will be entered at a date convenient to all parties concerned."

In harmony with the court's memorandum, judgment was entered quieting title to the mineral interest in question on the 680 acres in defendants Youngren as against plaintiff Baker, and directing the clerk of the court to pay accrued royalties which had been paid into that office by defendant production company, to defendants Youngren.

Plaintiff's motion for a new trial being overruled, he has appealed.

Despite the various arguments and contentions made, the entire matter narrows down to the question of what is a practical interpretation and construction of the written instrument involved. It is conceded by the parties that the identical or a similar question has never been before this court. Cases somewhat analogous from other jurisdictions are cited, but, at best, they are merely persuasive. In its memorandum decision the trial court held the instrument to be unambiguous and, following the general rule mentioned in *Brungardt v. Smith,* 178 Kan. 629 [Syl. 4], 290 P. 2d 1039, stated that the intention of the parties must be gleaned from the four corners of the instrument when construed as a whole. We are in accord with that statement and approach to the question.

As was observed by the trial court, Baker, the grantee, acquired the right to execute new leases covering his interest if those existing at the time of the conveyance were forfeited or cancelled. He had the right, which he exercised, to determine what part of the lands under which he owned minerals would be leased, the terms of such leases and the lands to be included in each lease. As contended for by defendants, we think the fact the lands described in the conveyance were subject to various leases and that production might have been obtained under any one or all of them during their primary terms and during the primary term of plaintiff's interest, is important in determining the intention of the parties. The lands in question were subsequently divided into new units by other leases and agreements. Timely production under any one of those leases would have perpetuated that lease and plaintiff's interest in the lands covered by such lease. Had the parties intended, as contended for by plaintiff in this action, it would have been a simple matter to have expressed such intention by including in the instrument a recital to the effect that production on *any* portion of the lands described would perpetuate and extend plaintiff's interest on *all* of the lands, even though royalty from a specific producing lease was attributable only to the lands covered by such lease. They did not do so. We agree with the trial court that each oil and gas lease on any part of the entire tract covered the minerals and mineral rights of both parties, but only on the lands described in each particular lease.

A point is made of the fact that on October 30, 1952, the parties executed an agreement which modified a previously executed gas unitization agreement. This matter was adequately and properly covered in the trial court's memorandum and, as indicated, was for

the purpose of correcting the acreage description and was executed for the benefit of lessee defendant production company, and is not to be construed as a recognition of rights claimed by plaintiff in this action.

Considerably more on the subject could be said but it would be largely repetitious of what is contained in the trial court's memorandum. Various contentions made by plaintiff have not been overlooked or ignored, but, in view of our conclusion, require no discussion. We think the trial court correctly analyzed the questions presented and arrived at a correct conclusion.

The judgment is therefore affirmed.